IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 19-00315-01-CR-W-DGK |
| | ) | |
| LADELE D. SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO
DEFENDANT SMITH'S MOTIONS TO SUPPRESS**

Before the Court are Defendant Smith's Motion to Suppress Evidence Seized Pursuant to

Search Warrant Obtained for Social Media Records and Motion to Suppress Evidence Seized

Pursuant to an Order Authorizing Interception of Wire and Electronic Communications.

Defendant moves the Court to suppress all evidence obtained pursuant to warrants for his social

media accounts as well as any evidence obtained pursuant to February 26, 2019, and June 13,

2019, wiretaps. For the following reasons, Defendant's motions should be denied.

## I. INTRODUCTION

On October 1, 2019, an Indictment was returned charging Defendant Smith with one count

of conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A),

(B), (C), (D) & 846, and one count of maintaining a drug-involved premises, in violation of 21

U.S.C. § 856(a)(1) and (b). (Doc. 1) On October 13, 2020, a Superseding Indictment was returned

that added the following charges against Defendant Smith: one count of conspiracy to possess

firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(o); one count

of possessing firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §

1

924(c)(1)(A)(i); one count of drive-by shooting, in violation of 18 U.S.C. § 36; one count of discharging a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); one count of distribution of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D); one count of distribution of marijuana near a school, in violation of 21 U.S.C. §§ 841(a)(1) and 860; four counts of distribution of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(C); and four counts of distribution of heroin near a school, in violation of 21 U.S.C. §§ 841(a)(1) and 860. (Doc. 234)

On June 21, 2022, Defendant Smith filed a motion to file the instant suppression motions out of time. (Doc. 641) After reviewing the Government's opposition, the Court granted Defendant's motion.[1] (Docs. 652, 661) Defendant's suppression motions were filed on June 24, 2022. (Docs. 667, 668) The Government filed a consolidated response on July 7, 2022. (Doc. No. 686) On July 8, 2022, a joint evidentiary hearing[2] was held on the limited issue of the scope of the search as it related to the social media records.[3] (Doc. 687) The Government appeared by Assistant United States Attorneys Ashleigh Ragner and Ben Hurst. Defendant Franklin was present, represented by appointed counsel Justin Johnston. Defendant Smith was present,

---

[1] The Government states within its suggestions in opposition that it does not interpret the Court's order granting Defendant's motion for leave to file the instant suppression motions out of time (Doc. 661) "as finally resolving the question of timeliness" and reasserts its timeliness objections. (Doc. 686, pp. 4-6) Such objections are overruled. Defendant Smith's motions were filed nine months after the pretrial motion deadline had passed. However, given the good cause shown for Defendant Franklin's filings (Doc. 709), and the substantial similarity in issues between the two, the Court explicitly finds good cause supports Defendant Smith's late filings and will address the issues on the merits.

[2] Defendant Smith's motions are virtually identical to motions to suppress evidence obtained from social media records and from wire and electronic communication interceptions already filed by co-defendant Franklin. (Docs. 647, 648)

[3] Following a June 28, 2022, status conference, upon the parties' request, the Court noticed the hearing to encompass both the scope of the search as it related to social media records and the issue of necessity as it related to the Title III wiretap affidavits and applications. (Doc. 675) After hearing argument on the scope of testimony at the outset of the July 8, 2022, evidentiary hearing (Tr. at 3-11), the Court limited the scope of the hearing to the search of social media records only and allowed defense counsel to make an offer of proof as to the questions they would have asked on the topic of necessity. (Tr. at 13, 53-57)

represented by appointed counsel Angela Hasty. The Government called FBI Special Agent Douglas McKelway to testify. The following exhibits were admitted into evidence:

| | |
|---|---|
| Government's Exhibit 1: | Search Warrant 18-SW-00222-JTM (Smith Instagram); |
| Government's Exhibit 2: | Search Warrant 18-SW-00337-REL (R. Franklin Instagram); |
| Government's Exhibit 3: | Title III Order and Documents: 19-WT-00001-RK for Target Telephone 1 (T. Garner); |
| Government's Exhibit 4: | Title III Order and Documents: 19-WT-00003-RK for Target Telephone 6 (R. Franklin); |
| Government's Exhibit 5: | Title III Order and Documents: 19-WT-00003-RK for Target Telephones 8 (Martin)[4] & 9 (R. Franklin); |
| Government's Exhibit 6: | Search Warrant 18-SW-00223-JTM (Smith YouTube); |
| Government's Exhibit 7: | Search Warrant 18-SW-00362-JTM (Smith Snapchat); and |
| Government's Exhibit 8: | Instagram Business Record (FBI193_0001 and FBI314_00001) (Smith & R. Franklin). |

## II. FINDINGS OF FACT

On the basis of the evidence presented at the suppression hearing, the undersigned submits the following proposed findings of fact:

1.     Douglas McKelway is a Special Agent with the FBI and is currently assigned to the Violent Crimes Squad. (Tr. at 15) Special Agent McKelway is the case agent in this matter. (Tr. at 16)

2.     Special Agent McKelway has been with the FBI since 2016. As a Special Agent assigned to the Violent Crime/Gang Squad, his official duties include, but are not limited to, investigation into gangs, criminal violations of the Controlled Substances Act, violent offenses, organized crime, and ongoing criminal enterprises. During his tenure with the FBI, he has participated in numerous gang and controlled substance violation investigations. While conducting such investigations, he has been the affiant on Title III intercepts, pen registers, and

---

[4] Although the Government's Exhibit List identifies Target Telephone 8 as relating to Defendant Martin (Doc. 683), the record presently before the Court indicates Target Telephone 8 was used by Defendant Smith and the Court will perform its analysis as such.

Global Positioning System (GPS) cellular telephone tracking warrants. He has conducted extensive interviews, controlled drug purchases, surveillance, and served search and arrest warrants. He has received specialized training in the enforcement of federal controlled substances laws as well as on conducting Title III investigations. (Gvt. Exh. 2, ¶ 4 at WARR_01588-WARR_01589; Gvt. Exh. 7, ¶ 4 at WARR_01684-WARR_01685)

3.     Special Agent McKelway's training and experience with the FBI has involved, *inter alia*: (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and the laundering and concealment of proceeds of drug trafficking; (b) surveillance; (c) analysis of documentary and physical evidence; and (d) participation in wire intercept investigations. Based on his training and experience, Special Agent McKelway has become familiar with the manner in which illegal drug traffickers conduct their drug-related businesses, including the methods employed by drug dealers to import and distribute illegal drugs, and their use of coded language to refer to illegal drugs, drug proceeds, and other aspects of illegal drug trafficking. He has been personally involved in numerous investigations involving the unlawful possession, manufacture, distribution, and smuggling of controlled substances. (Gvt. Exh. 2, ¶ 4 at WARR_01589; Gvt. Exh. 7, ¶ 4 at WARR_01684-WARR_01685)

4.     On June 12, 2018, United States Magistrate Judge Matt J. Whitworth signed a search warrant for Defendant Smith's Instagram account. (Tr. at 25; Gvt. Exh. 1) The warrant application sought to search Defendant Smith's Instagram account, associated with the vanity names "dogg_246", "dellio_4", "dellio_246" and "Del_Chapo_", for evidence concerning violations of possession with the intent to distribute/distribution of a controlled substance, in

violation of 21 U.S.C. § 841(a)(1), and money laundering, in violation of 18 U.S.C. §§ 1956, 1957. (Gvt. Exh. 1)  The executed warrant was provided to Facebook, along with Attachment A.  (Tr. at 52)  A separate warrant, supported by the same affidavit, was issued for Defendant's YouTube account the same date.  (Gvt. Exh. 6)

  5. In response to the search warrant for Defendant Smith's Instagram account, Facebook provided data for the date range of June 7, 2017, through June 12, 2018.  (Tr. at 23-24, 25; Gvt. Exh. 8 at FBI193_00001)

  6. On September 26, 2018, Special Agent McKelway submitted a search warrant application to United States Magistrate Judge Robert E. Larsen.  (Gvt. Exh. 2)  The warrant application sought to search Defendant Franklin's Instagram account, associated with the vanity name "Drankvett," for evidence concerning violations of possession with the intent to distribute/distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and money laundering, in violation of 18 U.S.C. §§ 1956, 1957.  (Gvt. Exh. 2)  Paragraph 16 of the affidavit advises, and includes through Attachment B, that a search warrant for Ladele Smith's Instagram accounts had been obtained.  (Gvt. Exh. 2)

  7. The items to be seized pursuant to the warrant application were incorporated through Attachment A, which identified the particular thing to be seized for the date range of January 1, 2017, through the then-present date.  (Gvt. Exh. 2 at WARR_01608-WARR_01612)

  8. Judge Larsen signed the search warrant for Defendant Franklin's Instagram account on September 26, 2018.  (Tr. at 25-26; Gvt. Exh. 2)

  9. The executed warrant, along with Attachment A, was provided to Facebook.  (Tr. at 52; Gvt. Exh. 2 at WARR_01535-WARR_1541)

10.     Facebook owns Instagram.  (Tr. at 17)

11.     In response to the search warrant for Defendant Roy Franklin's Instagram account, Facebook provided data for the date range of September 26, 2017, through September 26, 2018. (Tr. at 24, 25; Gvt. Exh. 8 at FBI314_00001)

12.     Special Agent McKelway testified that the general procedure when investigators obtain a search warrant for an Instagram account involves submitting the signed warrant to Facebook through an online portal.  (Tr. at 16-17)  Upon receiving notification that the responsive data is ready, investigators download the data from the portal both in .pdf and .html format.  (Tr. at 17, 29)

13.     FBI investigators then upload the .html files into a program called "Mint."  (Tr. at 17)  Mint enables investigators to more easily review and narrow data.  (Tr. at 18, 29)  Specifically, the program allows investigators to rank the Instagram user's contacts, filter data through keywords and locations, view results chronologically, and compare multiple data sets from different social media accounts.  (Tr. at 18, 22, 38)

14.     Special Agent McKelway testified that when the data provided by Facebook includes photographs, investigators look at each one because Mint does not provide a filtering mechanism for photographs.  (Tr. at 19)  Additionally, performing an individual review of the photographs is valuable to investigators because it may provide relevant information not retrievable by keyword (i.e., location, user of the account, unexplained wealth).  (Tr. at 19, 51-52)

15.     Special Agent McKelway testified that in drug conspiracy cases, he searches social media records to determine the breadth of the conspiracy.  (Tr. at 22)  He looks for who is involved, what their roles are, who holds the roles of suppliers/distributors/customers/enforcers, and who

6

helps maintain residences and rent cars. (Tr. at 22) Special Agent McKelway also looks for the types and weights of drugs being sold and whether, and to what extent, firearms are being used. (Tr. at 22)

16.     With regard to the specific searches performed in this case, Special Agent McKelway testified that he performed keyword searches for "816" or "913" in order to learn the phone numbers suspects were using. (Tr. at 19) He was particularly interested in the phone numbers Defendant Smith was using because Defendant Smith changed his number regularly. (Tr. at 19-20) Special Agent McKelway testified he also performed keyword searches for slang words referring to drugs, drug amounts, firearms, money, and the names and/or monikers of known co-conspirators. (Tr. at 20-21, 50)

17.     Special Agent McKelway testified that in cases like the instant matter, the keywords he uses to search for drugs include "OG Kush" (referencing marijuana), "boy" (referencing heroin), "girl" (referencing cocaine), "fire" (referencing marijuana), "kill" (referencing marijuana), "lean" or "drink" (referencing codeine), and "perk" (referencing Percocet or prescription pills). (Tr. at 20-21) Other typical keyword search terms include slang terms for the weights of drugs, such as "QP," "zip," or "Z28." (Tr. at 21) Search terms related to firearms include "heat," "stick," "Glock," "AK," "45," and "drake." He also uses slang terms for money, such as "bread." (Tr. at 21)

18.     Only when a keyword search produces results does Special Agent McKelway expand the conversation to look at the surrounding context. (Tr. at 21-22, 50)

19.     Special Agent McKelway testified he followed the above-described procedure when executing the search warrant for both Defendant Smith and Defendant Roy Franklin's

7

Instagram accounts. (Tr. at 23, 26, 48) He did not perform any searches related to location. (Tr. at 39)

20.     Special Agent McKelway does not specifically remember each of the search terms he used. (Tr. at 45-46)

21.     Special Agent McKelway did not keep a contemporaneous log or notes of the specific searches performed. (Tr. at 43-44)

22.     Some of the results produced by Special Agent McKelway's keyword searches revealed conversations that were not relevant to this case. (Tr. at 37, 49)

23.     Special Agent McKelway testified he did not open the files and individually review the .html files without the use of Mint, nor did he conduct any searches within the .pdf file or scroll its pages. (Tr. at 30, 39-41)

24.     Special Agent McKelway did, however, review most of the images related to Defendant Smith and Franklin's accounts. (Tr. at 36, 49) While doing so in Defendant Franklin's account, he saw images that did not display drugs, money, guns, violence, criminal activity, or targets/named defendants. (Tr. at 36-37) With regard to Defendant Smith, Special Agent McKelway saw images that pertained to Defendant Smith's music career. (Tr. at 49)

25.     Special Agent McKelway testified that he has access to Cellebrite. (Tr. at 30) He has not used the program to review native files produced by social media platforms or to use facial recognition algorithms, including in this case. (Tr. at 30-33, 48) Special Agent McKelway has used Cellebrite to review an iCloud warrant return. (Tr. at 31)

26.     Special Agent McKelway testified that at the time investigators reviewed the data produced pursuant to the search warrants for Defendants Smith and Franklin's social media

8

accounts, use of a facial recognition algorithm would have been too limiting since investigators did not yet know the full extent of the conspiracy. (Tr. at 33) Likewise, Special Agent McKelway would not have used a tool that searched by exemplar images because images often appear differently and he would not trust a program to filter the images appropriately. (Tr. at 35)

27.     Special Agent McKelway testified that conversations or images that may not initially appear on their face to be related to drug trafficking may still be relevant, in that they can show who is utilizing the account or pertain to related topics such as unexplained wealth. (Tr. at 51-52)

28.     Special Agent McKelway testified that even if he had not first obtained Defendant Franklin's Instagram data, he still would have sought a wiretap for Defendant Franklin's cell phones (Target Telephones 6 and 9). (Tr. at 26-27) Special Agent McKelway explained that investigators had intercepted Target Telephone 6 on several occasions talking to Target Telephone 1 (Defendant Terrance Garner) about drug-related matters. (Tr. at 27) In such conversations, the user of Target Telephone 1 referred to the user of Target Telephone 6 as "Roy." (Tr. at 27) Investigators knew through source reporting that Defendant Roy Franklin was a close associate of Defendant Smith and that Defendant Roy Franklin was an enforcer for the 246 organization. (Tr. at 27-28) Special Agent McKelway further testified that a wiretap was sought for Target Telephone 9 based on interceptions investigators had received from Target Telephone 7. (Tr. at 28)

29.     On October 4, 2018, United States Magistrate Judge Sarah W. Hays signed a resubmitted search warrant for Defendant Smith's Snapchat account. (Gvt. Exh. 7) This warrant was sought for the same vanity names associated with Defendant Smith, but corrected the account

names by removing the "@" contained in the original warrant. (Gvt. Exh. 7, ¶ 43 at WARR_01707)

### III. <u>DISCUSSION</u>

Although separate motions, the issues raised in Defendant's motions to suppress are related. Both the search warrant for Defendant's social media accounts and the Title III wiretap were sought as part of the Government's investigation of Defendant and the 246 organization. Defendant maintains the search warrant for his social medial accounts lack probable cause and fails to meet the particularity requirement. Defendant challenges the wiretaps on grounds that the applications fail to establish probable cause and necessity. Each motion will be addressed below.

### A. SEARCH WARRANT FOR SOCIAL MEDIA ACCOUNTS

At the outset, the Court notes a lack of clarity identifying the search warrant(s) at issue. As part of the introduction, Defendant Smith's motion states it challenges "*a search warrant obtained June, 2018, for an Instagram Account bearing User ID 14828797, and Username 'Dogg_246' (the "Instagram Records"), a You[T]ube Account bearing the name Cartelvision, a Snapchat account of various names, and any evidence constituting 'fruits' therefrom.*" (Doc. 668, p.1) (emphasis added) Three separate warrants were, in fact, issued for Defendant's social media accounts: the June 12, 2018, warrant issued by Judge Whitworth for Defendant's Instagram account (Gvt. Exh. 1); the June 12, 2018, warrant issued by Judge Whitworth for Defendant's YouTube account (Gvt. Exh. 6); and the October 4, 2018, warrant issued by Judge Hays for Defendant's Snapchat account (Gvt. Exh. 7). The affidavits supporting the Instagram and YouTube warrants are the same; Task Force Officer Straubel is the affiant. (*See* Gvt. Exhs. 1, 6) Special Agent McKelway is the affiant on the Snapchat affidavit. (Gvt. Exh. 7) When asked during the evidentiary hearing for

10

clarification on which warrants were being challenged, counsel for Defendant Smith ultimately responded, "all the search warrants that have been submitted and signed." (*See* Tr. at 10-11) Although Defendant's motion does not contain argument specific to, or citation of, the warrants for Defendant's YouTube and Snapchat accounts (Gvt. Exhs. 6, 7), the Court will address all three out of an abundance of caution.[5]

## 1. PROBABLE CAUSE

Issuance of a search warrant must be supported by probable cause, which exists under a totality of the circumstances, when there is a fair probability that contraband or evidence of a crime will be found in a particular place. *United States v. Smith*, 21 F.4th 510, 514 (8th Cir. 2021) (quoting *United States v. Gater*, 868 F.3d 657, 660 (8th Cir. 2017)); *United States v. Daigle*, 947 F.3d 1076, 1081 (8th Cir. 2020); *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016). A search warrant application must contain "evidence of a nexus between the contraband and the place to be searched." *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017) (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016)). Judges may draw reasonable inferences when determining the existence of probable cause. *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009). Judges can also consider the experience of the affiant. *See, e.g., id*. at 943-44; *United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007). *But cf. United States v. Brunette*, 256 F.3d 14, 18-19 (1st Cir. 2001) (holding magistrate judge should have independently reviewed photographs rather than relying on affiant's conclusion that the images were pornographic). "[P]robable cause is about fair probabilities, not near certainties." *United States v. James*, 3 F.4th

---

[5]Defendant lacks standing, however, to challenge the search warrant for Defendant Franklin's Instagram account (Gvt. Exh. 2). *United States v. White*, 962 F.3d 1052, 1054 (8th Cir. 2020).

1102, 1105 (8th Cir. 2021) (quotation omitted).

A reviewing court must ensure that the magistrate judge who issued the warrant "had a 'substantial basis for concluding that probable cause existed.'" *Johnson*, 848 F.3d at 876 (quoting *Colbert*, 828 F.3d at 726). Review is thus limited to the four corners of the affidavit that was relied upon by the issuing judge. *Daigle*, 947 F.3d at 1081; *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005).

**a.      June 12, 2018, Instagram and YouTube Warrants**

In this case, examination of the information contained within the four corners of Task Force Officer Staubel's affidavits reveals a substantial basis for Judge Whitworth to have concluded that probable cause existed. Specifically, the affidavits supporting the applications state that Defendant has been identified as having a leadership role within the 246 organization. (Gvt. Exh. 1, ¶ 12 at WARR_01410; Gvt. Exh. 6, ¶ 12 at WARR_01471) Investigators had identified multiple criminal offenses that members of the 246 organization and their associates participated in, including illegal drug distribution and trafficking. (Gvt. Exh. 1, ¶ 12 at WARR_01410-WARR_01411; Gvt. Exh. 6, ¶ 12 at WARR_01471-WARR_01472) The affidavit then sets forth law enforcement's bases for believing Defendant's Instagram and YouTube accounts contained evidence of crime.

First, CS-3 told FBI Investigators that Defendant was getting "reckless" with his drug dealing activities. (Gvt. Exh. 1, ¶ 19 at WARR_01413; Gvt. Exh. 6, ¶ 19 at WARR_01474) CS-3 based this statement on Defendant's Instagram posts where Defendant posted photographs of himself and an associate that contained money, guns, and "lean" (a codeine and cough syrup mixed drink). (Gvt. Exh. 1, ¶ 19 at WARR_01413; Gvt. Exh. 6, ¶ 19 at WARR_01474) Copies of these photographs were provided as Attachment B for Judge Whitworth's review. (Gvt. Exh. 1,

Attachment B at WARR_01441-WARR_01444; Gvt. Exh. 6, Attachment B at WARR_01502-WARR_01505) *See United States v. Nyah*, 928 F.3d 694, 698 (8th Cir. 2019) (affirming probable cause determination based, *inter alia*, on photographs posted to Facebook profile). CS-3 further stated Smith had started selling heroin. (Gvt. Exh. 1, ¶¶ 19, 27 at WARR_01413, WARR_01417; Gvt. Exh. 6, ¶¶ 19, 27 at WARR_01474, WARR_01478) CS-3 is a documented confidential source who has previously provided verified and reliable information to investigators. (Gvt. Exh. 1, ¶ 20 at WARR_01413-WARR_01414; Gvt. Exh. 6, ¶ 20 at WARR_01474-WARR_01475)

Second, the affidavit sets forth information law enforcement obtained through intercepted communications authorized by the District of Kansas that implicated Defendant in drug distribution. (Gvt. Exh. 1, ¶¶ 22-25 at WARR_01414-WARR_01416; Gvt. Exh. 6, ¶¶ 22-25 at WARR_01475-WARR_01477) Physical surveillance also suggested Defendant could be a supplier within the drug organization. (Gvt. Exh. 1, ¶¶ 29, 32 at WARR_01418-WARR_01420; Gvt. Exh. 6, ¶¶ 29, 32 at WARR_01479-WARR_01481)

Third, the affidavit states CS-2 provided investigators with a screenshot of an Instagram post under Defendant's vanity name. (Gvt. Exh. 1, ¶ 30 at WARR_01419; Gvt. Exh. 6, ¶ 30 at WARR_01480) The image displayed several large stacks of bundled United States currency, which appeared to be approximately $150,000.00. (Gvt. Exh. 1, ¶ 30 at WARR_01419; Gvt. Exh. 6, ¶ 30 at WARR_01480) The affidavit states Defendant has no reported wages in Missouri or Kansas for the past 10 years. (Gvt. Exh. 1, ¶ 31 at WARR_01419; Gvt. Exh. 6, ¶ 31 at WARR_01480) Defendant also had no reported wages in any other state in 2016 or 2017. (Gvt. Exh. 1, ¶ 31 at WARR_01419; Gvt. Exh. 6, ¶ 31 at WARR_01480)

Lastly, through the course of the investigation, investigators learned that members of the

246 organization regularly and frequently utilized internet-based websites and applications including Instagram, YouTube and Snapchat to post photos, videos, songs or "raps"; public posts on Instagram frequently showed Defendant and others posing with firearms, illegal drugs, and bulk quantities of United States currency. (Gvt. Exh. 1, ¶¶ 34, 35, 36 at WARR_01421-WARR_01423; Gvt. Exh. 6, ¶¶ 34, 35, 36 at WARR_01482-WARR_01484)  On March 26, 2017, August 29, 2017, December 25, 2017, and February 28, 2018, Defendant publicly posted videos on YouTube which contained lyrics that Task Force Officer Straubel explained to describe, *inter alia*, drug trafficking and sales. (Gvt. Exh. 1, ¶¶ 37-38 at WARR_01423-WARR_01427; Gvt. Exh. 6, ¶¶ 37-38 at WARR_01484-WARR_01488)  At the conclusion of each of these videos, the screen depicts the Instagram symbol with Defendant's vanity name and the Snapchat symbol with Defendant's vanity name. (Gvt. Exh. 1, ¶¶ 37-38 at WARR_01423-WARR_01427; Gvt. Exh. 6, ¶¶ 37-38 at WARR_01484-WARR_01488)  Screenshots taken from videos contained on Defendant's YouTube account depicting the Instagram and Snapchat symbols were provided as Attachment C for Judge Whitworth's review. (Gvt. Exh. 1, Attachment C at WARR_01445, WARR_01446, WARR_01448, WARR_01449; Gvt. Exh. 6, Attachment C at WARR_01506, WARR_01507, WARR_01507, WARR_01509, WARR_01510)  Although Defendant argues the lyrics contained within the videos are merely "common tropes within the genre of hip-hop/rap", Task Force Officer Straubel provides information to conclude otherwise. (Gvt. Exh. 1, ¶ 37 at WARR_01423-WARR_01427; Gvt. Exh 6, ¶ 37 at WARR_01484-WARR_01488)  Through training and experience, Task Force Officer Straubel is familiar with illegal drug traffickers' use of coded language to refer to illegal drugs, drug proceeds, and other aspects of illegal drug trafficking. (Gvt. Exh. 1, ¶ 4 at WARR_01406-WARR_01407; Gvt. Exh. 6, ¶ 4 at WARR_01467-WARR_01468)

14

As such, Judge Whitworth was entitled to rely on Task Force Officer Staubel's interpretations to support both search warrant applications. *See Keele*, 589 F.3d at 944.

The totality of these circumstances, as established through confidential sources, investigators' review of publicly-posted images from Defendant's Instagram and YouTube accounts, and Task Force Officer Straubel's interpretation of such information, demonstrate that the affidavits contained a sufficient nexus between the crimes of possession with the intent to distribute/distribution of a controlled substance and Defendant's Instagram and YouTube accounts. Defendant's motion to suppress should be denied on this basis.

**b.    October 4, 2018, Snapchat Warrant**

Investigators obtained information from CS-1 that revealed Defendant's primary social media application was Snapchat, and his Snapchat ID was "@DOG". (Gvt. Exh. 7, ¶ 16) CS-1 is a documented confidential source who has provided verified and reliable information to investigators. (Gvt. Exh. 7, ¶ 17) A member of another drug trafficking organization told investigators upon his arrest that Defendant's Snapchat vanity name was "DOG". (Gvt. Exh. 7, ¶ 33) Identical facts as set forth above supporting the applications for Defendant's Instagram and YouTube warrants can be found in Special Agent McKelway's affidavit in support of the October 4, 2018, Snapchat warrant. (*See* Gvt. Exh. 7 at ¶¶ 12, 19-20, 22-25, 27, 29-32, 34-38). Attachment B, containing pictures from Defendant's public Instagram posts, and Attachment C, containing screenshots from videos on Defendant's YouTube account depicting the Snapchat symbol with Defendant's vanity name, were attached for Judge Hays' reference. (Gvt. Exh. 7) Special Agent McKelway is familiar with the manner in which illegal drug traffickers conduct their drug-related businesses, including their use of coded language to refer to illegal drugs, drug proceeds, and other

15

aspects of illegal drug trafficking (Gvt. Exh. 7 at ¶ 4), and interpreted the lyrics in Defendant's YouTube videos to reference illegal drug distribution (Gvt. Exh. 7 at ¶ 37). For the same reasons as those identified for the Instagram and YouTube warrants, the Court finds a substantial basis supports Judge Hays' conclusion that probable cause existed to issue the search warrant for Defendant's Snapchat account.

## 2. PARTICULARITY AND BREADTH OF INSTAGRAM WARRANT

Defendant also contends the June 12, 2018, warrant for his Instagram account did not satisfy the Fourth Amendment's particularity requirement because the warrant sought the entirety of his account. Defendant argues that, without meaningful limitations in scope and time, the warrant was akin to a general warrant. The Court disagrees.

The Fourth Amendment requires warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. *See also United States v. Eggerson*, 999 F.3d 1121, 1124 (8th Cir. 2021); *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007). "The degree of specificity required will depend on the circumstances of the case and on the type of items involved." *Summage*, 481 F.3d at 1079. "The particularity requirement 'is a standard of "practical accuracy" rather than a hypertechnical one.'" *Id*. (quoting *United States v. Peters*, 92 F.3d 768, 769-70 (8th Cir. 1996)).

When evaluating the particularity requirement, the Eighth Circuit has focused on whether the offense being investigated was sufficiently identified in the warrant. *United States v. Good Voice*, No. 3:21-CR-30059-RAL, 2022 WL 1448851 at *11 (D.S.D. May 9, 2022) (collecting cases). This standard enables the searcher "to locate and identify the places and items with reasonable effort and to avoid mistakenly searching the wrong places or seizing the wrong items."

16

*United States v. Gleich*, 397 F.3d 608, 612 (8th Cir. 2005).  The failure of a warrant "to anticipate the precise form in which [the data] would appear," however, is not fatal.  *United States v. Lowe*, 50 F.3d 604, 607 (8th Cir. 1995).

In *United States v. Jones*, the District of Minnesota found that the particularity requirement was satisfied in an approach very similar to the approach challenged here.  No. 19-cr-341 (NEB/LIB), 2021 WL 1321270, at *12-*13 (D. Minn. Jan. 7, 2021).  In *Jones*, law enforcement submitted an application to search the contents of the defendant's Facebook account.  2021 WL 1321270 at *6.  "Section I" of "Attachment B" to the application sought Facebook to *disclose* broad categories of information from the defendant's account.  *Id*. "Section II" of "Attachment B" to the application then sought authorization for law enforcement to *seize* more limited categories of information that were tied to the charged offense and limited in time.[6]  *Id*.  In finding the application to be sufficiently particular, the *Jones* Court explained, "[t]he Facebook account was identified by the specific account number, and the Search Warrant delineated the items to be included in the search."  *Id*. at 13.

The same outcome should be reached in this case.  Although Defendant urges an approach that would require warrants to request specific information from social media companies, the June 12, 2018, search warrant submitted for Defendant's Instagram account comports with the law of this Circuit.  *See United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008); *United States v. Sherman*, 372 Fed. Appx. 668, 676 (8th Cir. 2010); *Gleich*, 397 F.3d at 612; *Good Voice*, 2022 WL 1448851 at *11; *Jones*, 2021 WL 1321270 at *12.  Moreover, law enforcement's ability to

---

[6]The Court notes this approach is also consistent with Federal Rule of Criminal Procedure 41(e)(1)(B) which provides, "A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure of copying of electronically stored information.  Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant."

successfully predict where information may be found is, as a practical matter, uncertain at best since information may be concealed or seem irrelevant on its face. *See Lowe*, 50 F.3d at 607; *Good Voice*, 2022 WL 1448851 at *12.

Here, Attachment A to the search warrant application for Defendant's Instagram account specifically identified Defendant's User ID and Username/Vanity Name. (Gvt. Exh. 1, at WARR_01397) The language contained within Section II of Attachment A limited the items to be seized to information that constituted fruits, evidence and instrumentalities of violations of, *inter alia*, Title 21, United States Code, Sections 841(a)(1), possession with the intent to distribute/distribution of a controlled substance. (Gvt. Exh. 1, at WARR_01399-WARR_01400) Section II of Attachment A lists the specific types of information from January 1, 2017, through the then-present date to include:

> a) Communications by the Target Subjects as well as any communication regarding narcotics trafficking, gang related matters, firearms, homicides, and business or crimes related to Ladele D. Smith and his associates; photographs related to narcotics trafficking, gang related matters, firearms, homicides, and business or crimes related to Ladele D. Smith and his associates; communication regarding narcotics trafficking and manufacturing; communication regarding acts of violence and efforts to avoid law enforcement apprehension; communication regarding the recruitment of new members; communication regarding the destruction of evidence; communication regarding the account user's location on the date of certain racketeering-related criminal acts; and
>
> b) Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.

(Gvt. Exh. 1, at WARR_01400) These limitations ensured against searching the wrong places and/or seizing the wrong items.

Attachment A also includes a temporal limitation. Although the warrant requested information starting on January 1, 2017, Facebook instead provided data beginning on June 7,

18

2017. (Fact No. 5) This time frame is appropriately limited given, for example, the March 26, 2017, YouTube video which investigators believe contained an admission that Defendant sells heroin, and which displays the Instagram symbol and Defendant's vanity name at the end. (Gvt. Exh. 1, ¶ 37(a) at WARR_01423) The Court, therefore, finds that the search warrant for Defendant's Instagram account satisfies the Fourth Amendment's particularity requirement and is not constitutionally overbroad.

## 3. EXECUTION OF INSTAGRAM WARRANT

Defendant next argues that the Government's search of the Instagram account data provided by Facebook exceeded the scope of the warrant. This argument is without merit.

Special Agent McKelway testified that when the FBI receives data from Facebook, investigators upload the .html files into a program called "Mint." (Fact No. 13) This program allows investigators to rank the Instagram user's contacts, filter data through keywords and locations, view results chronologically, and compare multiple data sets from different social media accounts. (Fact No. 13) Special Agent McKelway filtered the data from Defendant's Instagram account using Mint by performing keyword searches. (Fact No. 16) He searched for "816" and "913" to learn the phone numbers suspects were using; he also searched for slang terms referring to drugs, drug amounts, firearms, money, and the names and/or monikers of known co-conspirators. (Fact Nos. 16, 19) Only when the keyword searches produced results did Special Agent McKelway expand the conversation to look at the context. (Fact Nos. 18, 19) Special Agent McKelway testified he did not open and individually review the .html files without the use of Mint or conduct searches within or scroll the pages of the .pdf file. (Fact No. 23) Due to the fact that Mint did not have facial recognition capabilities and also because he did not trust a program to

19

appropriately filter images, Special Agent McKelway reviewed most images.  (Fact Nos. 24, 26)  He testified that individually reviewing the images was valuable because images may provide relevant information that is not evident on its face, such as location, the user of the account, or unexplained wealth.  (Fact No. 27)  This procedure reasonably limited the search to locate and seize the information identified in Section II of Attachment A.  Defendant's motion to suppress is denied on this ground.

### 4.    GOOD FAITH EXCEPTION TO THE EXCLUSIONARY RULE

Even if the search warrants were found to be deficient, either for a lack of probable cause or for failure to comply with the particularity requirement, evidence obtained therefrom should not be excluded based on application of the good faith exception to the exclusionary rule.  *See United States v. Leon*, 468 U.S. 897 (1984).  "In *Leon*, the Supreme Court held that evidence obtained pursuant to a subsequently invalidated search warrant need not be excluded from the prosecution's case in chief if the executing officers acted in objectively reasonable reliance on the issuing court's determination."  *United States v. Terry*, 305 F.3d 818, 823 (8th Cir. 2002) (citing *Leon*, 468 U.S. at 922-23).  *See also United States v. Szczerba*, 987 F.3d 929, 938 (8th Cir. 2018); *United States v. Ross*, 487 F.3d 1120, 1122 (8th Cir. 2007).

*Leon* identified "four circumstances in which an officer's reliance on an invalid warrant would not be objectively reasonable:  (1) when the issuing magistrate [judge] 'was misled by information in an affidavit that the affiant knew was false or would have known was false' absent 'reckless disregard of the truth'; (2) when the issuing magistrate [judge] 'wholly abandoned his judicial role'; (3) when the affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; and (4) when the warrant is 'so facially deficient –

*i.e.*, in failing to particularize the place to be searched or the things to be seized – that the executing officer cannot reasonably presume it to be valid.'" *United States v. Saddler*, 194 F.4th 1035, 1040 (8th Cir. 2021). *See also United States v. Barnes*, 9 F.4th 977, 979 (8th Cir. 2021). "[T]he fact that a neutral [judge] has issued a warrant is the clearest indication that . . . officers acted in an objectively reasonable manner or in objective good faith." *United States v. Harris*, No. 20-CR-98 (SRN/TNL), 2021 WL 3929270 at *3 (D. Minn. Sept. 2, 2021) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)).

In this case, the third and fourth circumstances are contemplated by Defendant's motion, but neither support suppression. As stated above, III(A)(1), the search warrants were supported by probable cause. Law enforcement knew the Court found the warrants to establish probable cause thus making the belief that probable cause existed objectively reasonable. Additionally, the limitations contained within Attachment A of the Instagram warrant were not so facially deficient that they could reasonably be presumed to be invalid. The Court, therefore, finds the good faith exception applies and that suppression is not appropriate.

## B. WIRETAP ORDERS

In order to obtain a wiretap, the government must establish the following four requirements:

(a) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
(b) There is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
(c) Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;
(d) . . . there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3).  Title III allows any aggrieved person to seek suppression of the contents of intercepted communications obtained in violation of this statute.  An "aggrieved person" is "a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed."  18 U.S.C. § 2510(11).  *See also United States v. Civella*, 648 F.2d 1167, 1172 (8th Cir. 1981).  Defendant appears to argue that the wiretap applications for Target Telephone 1 and Target Telephone 8 do not meet the probable cause or necessity requirements.  (Doc. 667, pp. 11, 15)

## 1.     PROBABLE CAUSE

"The probable cause requirement in [§ 2518] is linked to the Fourth Amendment."  *United States v. Thompson*, 690 F.3d 977, 984 (8th Cir. 2012); *United States v. Perez-Trevino*, 891 F.3d 359, 368 (8th Cir. 2018).  As such, "to grant an application for a wiretap, district courts must make a 'practical, common-sense decision whether,' considering the 'totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Thompson*, 690 F.3d at 984.  Only evidence contained within the four corners of the affidavit may be considered when reviewing the probable cause determination.  *Perez-Trevino*, 891 F.3d at 368.

### a.     Target Telephone 1

The February 26, 2019, affidavit in support of the wiretap application states that Terrance Garner was the primary user of Target Telephone 1.  (Gvt. Exh. 3, Exhibit C at ¶ 3)  Defendant Smith was identified as a Target Subject and someone to be in frequent contact with Target Telephone 1.  (Gvt. Exh. 3, Exhibit C at ¶¶ 7(f), 18(b))  The affidavit states that investigators believed there was probable cause to establish that the Target Subjects were committing the crimes of possession of a controlled substance with intent to distribute and distribution of a controlled

substance, and using Target Telephone 1 to do so. (Gvt. Exh. 3, Exhibit C at ¶¶ 4, 10, 11) The affidavit further states that Terrance Garner had been identified as a member of the 246 organization who was selling drugs. (Gvt. Exh. 3, Exhibit C at ¶ 12) CS-1 provided information concerning Terrance Garner's drug sales, including that s/he believed Defendant supplied Terrance Garner with heroin. (Gvt. Exh. 3, Exhibit C at ¶¶ 7(a), 14, 17) CS-1 is a documented confidential source for the FBI who has provided reliable and verified information. (Gvt. Exh. 3, Exhibit C at ¶ 19) As such, the District Court was entitled to rely on such information. *United States v. Mayweather*, 993 F.3d 1035, 1044 (8th Cir. 2021); *United States v. Brown*, 499 F.3d 817, 821 (8th Cir. 2007); *United States v. Wright*, 145 F.3d 972, 975 (8th Cir. 1998). Controlled purchases were made from Terrance Garner, during which he used Target Telephone 1. (Gvt. Exh. 3, Exhibit C at ¶¶ 14, 21) The affidavit further states a source of information identified Defendant as his/her supplier of heroin and stated s/he would call Defendant to "re-order." (Gvt. Exh. 3, Exhibit C at ¶ 16) Toll information revealed multiple contacts between Target Telephone 1 and Defendant. (Gvt. Exh. 3, Exhibit C at ¶ 18(b)) Intercepted calls captured Terrance Garner selling drugs using Title Telephone 1. (Gvt. Exh. 3, Exhibit C at ¶ 20) This information establishes a fair probability that Terrance Garner was committing crimes of possession with the intent to distribute and distribution of controlled substances, and that evidence of such crimes would be found on Target Telephone 1.

**b.   Target Telephone 8**

The probable cause requirement has also been satisfied for Target Telephone 8. The affidavit in support of the June 13, 2019, wiretap application set forth information concerning illegal drug distribution that had been linked to Defendant's prior phones. (Gvt. Exh. 5, Exhibit C at ¶¶ 40-42, 52-55). Following the arrest of a member of another drug trafficking organization, an

23

Instagram account used by Defendant posted a picture of Defendant holding a Gucci bag with the caption, "CHANGING MY NUMBERS AND GOING MISSIN." (Gvt. Exh. 5, Exhibit C at ¶ 65) The affidavit further stated that investigators believed Defendant now used Target Telephone 8. (Gvt. Exh. 5, Exhibit C at ¶¶ 13(a), 25). Interceptions from Target Telephones 1, 6 and 7 indicated Defendant was using Target Telephone 8 to facilitate the sale of illegal drugs. (Gvt. Exh. 5, Exhibit C at ¶¶ 13(a), 72, 75) The District Court was entitled to rely on Special Agent McKelway's interpretation of such calls. *See United States v. Bellomo*, 954 F. Supp. 630, 638 n.3 (S.D.N.Y. 1997) ("A court is justified in relying on an expert's opinion as to evidence in a wiretap application, . . . [as it] would defeat the purpose of the wiretap statute to allow criminals to avoid detection simply by using nicknames and code to disguise their activities."). The affidavit also stated that toll records for Target Telephone 8 showed numerous contacts with three individuals, all of whom appeared to be responsible for distributing heroin, cocaine, and marijuana in the Kansas City area. (Gvt. Exh. 5, Exhibit C at ¶¶ 13(s)-(u), 87-89, 99) Suppression of wiretap evidence related to Target Telephone 8 is not warranted.

## 2. NECESSITY FOR TARGET TELEPHONE 1 AND TARGET TELEPHONE 8

In order to establish necessity under § 2518(3)(c), law enforcement must "establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator." *United States v. Merrett*, 8 F.4th 743, 749 (8th Cir. 2021) (quoting *United States v. Campbell*, 986 F.3d 782, 793 (8th Cir. 2021)). The statute also allows law enforcement to establish necessity by describing why investigative techniques would be unlikely to be successful or too dangerous. *United States v. Turner*, 781 F.3d 374, 382-83 (8th Cir. 2015). The Eighth Circuit has repeatedly held that the government is not required to

exhaust every available investigative technique before applying for a wiretap, or to only use a wiretap as a last resort. *Merrett*, 8 F.4th at 749 (quotations omitted). *See also United States v. Colbert*, 828 F.3d 718, 725 (8th Cir. 2016); *United States v. Milliner*, 765 F.3d 836, 839 (8th Cir. 2014) ("The necessity requirement of § 2518 insures 'that wiretaps are not routinely employed as the initial step in an investigation.'"); *United States v. West*, 589 F.3d 936, 939 (8th Cir. 2009). "If law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and identity of each coconspirator, the necessity requirement is met." *United States v. Jackson*, 345 F.3d 638, 644 (8th Cir. 2003). The Court looks to the four corners of the wiretap application when evaluating necessity. *United States v. Campbell*, No. 17-CR-2045-LLR, 2018 WL 1156238 at 4 (N.D. Iowa Mar. 5, 2018) (citing *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir. 2005)). *See also Perez-Trevino*, 891 F.3d at 368, 370 (performing four-corners analysis on necessity argument).

In this case, the information in the February 26, 2019, wiretap application for Target Telephone 1 and the June 13, 2019, application for Target Telephone 8 related to necessity is largely the same and will be discussed together. The four corners of both applications establish the requisite necessity. The affidavits state that although investigators had been told that Defendant was involved in drug trafficking, they had not been able to identify his local contacts in the drug trade or confirm information regarding possible locations used to store drugs and/or money derived from drug sales. (Gvt. Exh. 3, Exhibit C at ¶¶ 51-53; Gvt Exh. 5, Exhibit C at ¶¶ 98-100) The affidavits further state that current investigative techniques being used had not been effective, reasonably appear to be unlikely to succeed if tried, or too dangerous to employ. (Gvt. Exh. 3, Exhibit C at ¶ 54; Gvt Exh. 5, Exhibit C at ¶ 102)

Specifically, physical surveillance had proven unsuccessful because Terrance Garner, Defendant and their associates were very sensitive to the presence of law enforcement investigators; Terrance Garner and Defendant had engaged in countersurveillance measures. (Gvt. Exh. 3, Exhibit C at ¶¶ 55-57, 61, 80; Gvt Exh. 5, Exhibit C at ¶¶ 103-105, 107)  Law enforcement was able to follow Terrance Garner on one occasion, but only because they had the assistance of a surveillance aircraft, use of which was limited due to maintenance, demand and weather conditions.  (Gvt. Exh. 3, Exhibit C at ¶ 57)  Additionally when surveillance had been conducted, it showed comings and goings, but did not reveal the reason, the context of conversations, or the identity of individuals with whom conversations were conducted.  (Gvt. Exh. 3, Exhibit C at ¶¶ 62-64; Gvt Exh. 5, Exhibit C at ¶ 114)  Some locations posed limitations for usefulness of pole cameras or covert surveillance cameras.  (Gvt. Exh. 3, Exhibit C at ¶ 63; Gvt. Exh. 5, Exhibit C at ¶ 113)  Surveillance on Terrance Garner presented a safety risk including, for example, brandishing a firearm as reported by a confidential informant.  (Gvt. Exh. 3, Exhibit C at ¶ 58)  Use of undercover officers and confidential sources also posed a safety risk.  (Gvt. Exh. 3, Exhibit C at ¶¶ 58, 65, 67; Gvt Exh. 5, Exhibit C at ¶¶ 108, 120)  Sources were unwilling or afraid to gather proactive evidence.  (Gvt. Exh. 3, Exhibit C at ¶¶ 66, 70, 71; Gvt Exh. 5, Exhibit C at ¶¶ 118, 123, 126)  Special Agent McKelway did not believe grand jury subpoenas would be successful, because targets would most likely be uncooperative and invoke their 5th Amendment right not to testify, which would only serve to further alert the targets of the investigation and cause them to become more cautious, flee or otherwise compromise the investigation.  (Gvt. Exh. 3, Exhibit C at ¶ 68; Gvt Exh. 5, Exhibit C at ¶ 121)  Mail covers had not been useful, and Special Agent McKelway did not believe trash pulls would be likely to provide evidence, since drug

26

traffickers often dispose of their trash in commercial dumpsters. (Gvt. Exh. 3, Exhibit C at ¶¶ 72, 74; Gvt Exh. 5, Exhibit C at ¶¶ 127, 129)  Financial investigations had not revealed large-scale movement of money consistent with the amount of drugs purported to have been sold. (Gvt. Exh. 3, Exhibit C at ¶ 76; Gvt Exh. 5, Exhibit C at ¶ 132)  GPS location monitoring had likewise not been effective. (Gvt. Exh. 3, Exhibit C at ¶¶ 59, 79; Gvt Exh. 5, Exhibit C at ¶ 135)  Pen registers and toll analysis were of limited value due to individuals, including Terrance Garner and Defendant, frequently switching phone numbers. (Gvt. Exh. 3, Exhibit C at ¶ 77; Gvt Exh. 5, Exhibit C at ¶ 133)  Instagram records provided historical information, but did not reveal the full extent of the drug trafficking activities. (Gvt. Exh. 3, Exhibit C at ¶ 78; Gvt Exh. 5, Exhibit C at ¶ 136)

Based on the above, the Court finds that the applications demonstrate the necessity of the wiretaps.  Both affidavits establish that conventional investigatory techniques had not been successful in exposing the full extent of the conspiracy and identity of each coconspirator. The respective affidavits included a full and complete statement as to whether or not investigative procedures had been tried and were unsuccessful or why they reasonably appeared to be unlikely to succeed if tried or were too dangerous.

3.      **GOOD FAITH EXCEPTION**

Even if the February 26, 2019, and/or the June 13, 2019, wiretap applications were found to be invalid, exclusion of evidence obtained therefrom is still not appropriate.  The Eighth Circuit has held that the good-faith exception to the exclusionary rule applies to wiretap orders. *United States v. Friend*, 992 F.3d 728, 731 (8th Cir. 2021).  Here, the affidavits in support of the applications contain the requisite evidence of probable cause and necessity, and law enforcement

knew that the Court agreed.  The good-faith exception prevents suppression.

## IV.  CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress evidence seized pursuant to the search warrant obtained for social media records (Doc. 668).  It is further

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress evidence seized pursuant to an order authorizing interception of wire and electronic communications (Doc. 667).

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this Report and Recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/ *Jill A. Morris*
_____
JILL A. MORRIS
UNITED STATES MAGISTRATE JUDGE

28